All rise. Hear ye, hear ye, hear ye. This Honorable Appellate Court for the Second Judicial Dismissal is now back in session. Pursuant to adjournment, the Honorable Thomas C. Hudson presides. By Glory. Please be seated. Your Honor, this case is about 2-16-0253. The Title Title Land Trust Co. v. Village of Roselle. Defendant Appellee. Arguing on behalf of Defendant Scott, Mr. James F. Griffin. Arguing on behalf of Defendant Appellee, Mr. John F. O'Reilly. I thank you. Mr. Griffin, on behalf of the appellant, you may proceed. Thank you. Good morning. May it please the Court and Counsel. My name is Jim Griffin. I am one of the attorneys here for the Plaintiff Appellant. And Mr. Emond is here. He's the beneficiary of the land trust that owns the subject property that is the plaintiff. Illinois drainage law is codified as 70 ILCS 605-2-1. And it states that land may be drained in the general course of natural drainage. Conversely, and as established in Elser v. Village of Grosse Pointe and many other cases, land may not be drained in an unnatural manner. Those principles are the foundation of Illinois drainage law. So the first step in this drainage dispute is determining the course of natural drainage in the vicinity of the subject property prior to Defendant Village of Roselle's installation of this relief sewer at issue in the case. Now, Your Honors, I have included on the board here Plaintiff's Exhibit Number 3 to assist this Court in understanding the location of the subject property and some of the improvements that I'll be discussing here. Is there any objection, Counsel, to his use of the indictment? I don't have an objection. All right, thank you. You may proceed. As you can see on Exhibit Number 3, the subject property is located adjacent to Roselle Road and that's shown in the black square, the rectangle. There is a drainage basin north of the subject property, and in this case it was called the Glenlake Subbasin.  This basin is shown in what's surrounded by the red line on the exhibit. Now, prior to the installation of the relief sewer, stormwater in the Glenlake Basin would flow into an existing stormwater sewer, which flowed to the east and then connected with another stormwater sewer that flowed south along Roselle Road. And that's shown in the green line. The green line that's going east to west in the middle of the subbasin is along Glenlake Avenue and that's the storm sewer that flows to the east connecting to the storm sewer that's along the north-south storm sewer along Roselle Road that flows to the south. Can I ask you a threshold question to clarify something? Yes. The trial court found, as I understand, based on the testimony of Mr. Burke, that the operation of the relief sewer did not cause an increase in the volume or the flow rate of the waters flowing out of the subject property, correct? Correct. And how are you phrasing your appeal that the court erred because it found that it was a reasonable increase? What are you arguing on appeal, specifically how the court erred? Well, the court erred in its application of Illinois drainage law, first by applying the reasonable development or good husbandry exception and by failing to, in its order, failing to find that the installation of the relief sewer changed the natural course of drainage to the subject property. So you're contesting that factual finding because the court, in essence, found, I think, a failure of proof. It found, believing the expert on the defense side, that the case wasn't proven. Well, there's two ways to demonstrate a violation of the Illinois drainage law. One is a change in the natural course of drainage, a change in the drainage pattern. And we're arguing today and in our briefs that the plaintiff demonstrated that. The plaintiff demonstrated the relief sewer changed the natural course of drainage. Based on the testimony of Mr. Hamilton? Correct. And based on testimony of the other two engineers who testified, who all testified as to the natural course of drainage, which I was describing. And that natural course of drainage was, Your Honor, prior to the relief sewer, what would happen is water would pond up in this Glenlake subbasin. And that's, again, the area around Glenlake Avenue, which is the green line. Water would pond up on a street and in the yards surrounding that. Prior to? Prior to. Because the stormwater system, the green that's there, didn't have sufficient capacity in a heavy storm. So the water would, what would happen is the water would go into that green stormwater sewer, flow to the east, and then flow south. That stormwater sewer didn't have sufficient capacity during heavy storms. So it would back up. It would back up on Glenlake Avenue. And it would flood the street and the yards nearby. Now, that subbasin, it's like a bowl. It's not readily visible when you're out there, but it is a bowl. And what would happen now during a heavy rain, when that bowl would fill up, it would overtop. And then it would, as the engineers described it, that flow would meander, that's the term they used, south and east in the direction of the subject property. Over the land. Over the land, right. It would overflow the basin and meander south and east towards the subject property. That was the natural course of drainage prior to the relief sewer. Now, the property itself did have a problem, did it not? Didn't I read perhaps in the briefs that it was below the grade or there was a problem with the subject property, wasn't there? The property had experienced seepage, which caused the carpeting in the basement to get wet and have to be dried out. And that was caused by this meandering flow from the south. Had nothing to do with the property? It wasn't below grade or something? Well, the basement was below grade, certainly. Yeah, the meandering flow flows south and east in the direction of the subject property. So the subject property is located topographically lower than the Gledelike Basin. So what then happens in 2008 is the village installs a relief sewer. That's the purple line going north-south. And you can see that that purple line, its southernmost endpoint, where it then begins to move to the southeast, is west of the parking lot of the subject property. And what effect did that new drainage system have with respect to major storms? Well, it changed the natural course of the drainage. Where this relief sewer is, that wasn't an existing ditch or anything like that. That was just simply where the village put the pipe. And so there was no drainage line that existed there. So what happened is during the heavy storms, the relief sewer also didn't have sufficient capacity to convey all the storm water that it was carrying. So what would happen is the water would back up in the relief sewer. It would surcharge is the engineering term. But what it is is the water would bubble up out of the relief sewer to the west of the subject property. And it would bubble up, and then it would overtop into the parking lot of the subject property and then get into the building in the basement. That's not the natural course of drainage. There was no natural course of drainage prior to the relief sewer in which water would bubble up west of the subject property, rise up, and fall onto the parking lot. You have a very compelling case based essentially on the plaintiff's version and based on the plaintiff's expert, but obviously you'd have to concede that Burke had a totally different opinion. No, not to this point, not at all. I mean, this is the ultimate opinion. Well, but I think this is an ultimate opinion, I believe, Your Honor, that the trial court erred in failing to find that a change in the natural course of drainage is a violation of Illinois drainage law without getting into the rates and volumes of fault. So your point is up to this point in the explanation, for lack of a better term, both experts agreed that this is what was happening? Prior to the relief sewer and after the relief sewer, correct. That it was bubbling up and that's what caused the excess water through the window well into the basement. Correct. Mr. Burke did not observe this. He was not out there during these flooding events, but he did not dispute that the relief sewer would, if it did not have sufficient capacity, would surcharge, bubble up, and come over. And we submitted evidence, Mr. Eden's testimony first of all, which was not disputed, and the video, which is Plaintiff's Exhibit No. 5, which is a video of one of the flooding events where you can actually see the water bubbling out of the area of the relief sewer and then overtopping and coming onto the parking lot. And that alone is a violation of Illinois drainage law because you're changing the natural course of drainage. That never existed before. There was never any water that would bubble up west of a subject property and overtop into the parking lot. Prior to the relief sewer, it was this meander flowing south and east from the Glenlight Basin. It wouldn't flow into the back of the parking lot. That alone is a change in drainage patterns, which is a violation of Illinois drainage law. And that was, we believe, one of the errors that, respectfully, that the trial court committed because what the trial court did was then apply some, you know, the good husbandry or reasonable development exception. But those exceptions don't apply when you're changing the natural course of drainage. And I have a couple quotes here from some cases we relied upon. A landowner has no right to collect surface water into artificial channels and discharge it on the land of another. That's the Elser v. Village of Groves Point case. And another point of law is no one has the right to collect water and by means of artificial channel, cast it upon land of another in undue quantities or contrary to its natural course. Were those takings cases? No, those were drainage flooding cases. Smith v. City of Woodstock, second district case, relying upon Elsner v. Village of Groves Point. Those were both flooding cases. So two ways to show a violation of Illinois drainage law, casting it in undue quantities or contrary to its natural course. And here it's undisputed that the water did not simply jump out of the ground west of the subject property prior to the relief sewer and flood the property. So that was a change in the natural course. Now, the village... Are you saying the trial court misread the evidence? I'm saying the trial court misapplied the law, misapplied Illinois drainage law. Because they should have found a violation first and then decided... They should have found a violation because of the change in the natural course of drainage. That was the first violation. Now, there was a lot of testimony and evidence as to the second violation, which I haven't gotten to, which you had the two experts have some disagreement upon. The impact... The mere change in the direction, whether or not it causes any increased volume or flooding on a subject property, is if so facto a violation of the law and entitles the plaintiff to damages. Exactly. It entitles the plaintiff to the injunctive relief we seek here, which is to terminate the use or the impact of this relief sewer. Our relief on those counts was injunctive, declaratory in nature. And that's... So you're saying there doesn't have to be a causal link between the village's action and the plaintiff's damages. The mere changing of it. You're saying the mere changing of it entitles the plaintiff to relief even if... Well, there is damages that are being caused by the relief sewer. The water is coming out of the ground west of the property, flooding the parking lot, and then getting into the building. In this particular case, you're submitting that there are damages as a result of the change in the flow. I think what Justice Hudson is asking you is, are you saying that the mere fact that you changed the flow is enough and you don't have to have damages? Well, we do have damages and we have experienced flooding. Yeah, but is there a causal link between the construction and the operation of the relief sewer and the increased flooding on the plaintiff's property? That's what we're talking about. You seem to be saying, hey, they changed the flow by this construction. Ergo, there's more water. We're entitled to damages even without establishing a causal link. At least the trial court found the causal link was not established sufficiently. Well, under the Illinois Drainage Law, creating a change in the drainage pattern alone is a violation of the Illinois Drainage Law. A landowner has no right to collect surface water into artificial channels and discharge it on the land of another. That's what's happened here. They didn't do that. They didn't discharge it, anything. It didn't affect the relief sewer. It did not affect the property beyond to which it was already subject to. That's the whole defense argument here. Well, they're basing it. Correct. That is their argument. But that fails to address the change in the natural course of drainage. That defense does not at all address the fact that you've got a new artificial sewer line here, storm sewer line, which did not exist, does not follow the natural path of drainage, which is now emitting storm water onto the subject property. But wasn't there storm water on the subject property prior to this sewer system? Not by this artificial channel that they've created. The natural course of drainage was different. Where did the storm water go before? Down the green line? Well, it would initially go down the green line and go east, and then south, and then cross Roselle Road. Now, when that system was insufficient, it would fill up the basin. It would fill up this Glenlake Basin. And then when that got filled up, sort of like a bowl, it would overtop in a southeasterly direction towards the subject property. So that would create overland flow in the direction of the subject property. But not at the same rate? Not at the same rate or surging? Well, certainly Mr. Hamilton, the plaintiff's executive, testified that the relief sewer, the purpose of the relief sewer, and what it did accomplish was bringing water south much faster. It brought water south much faster because not only because it was a pipe and not this meandering flow, but because the pipe was actually, the relief sewer was lower in elevation than the existing sewer going to the east. So when the water would dump in, it goes to its lowest point, which would be to the relief sewer going south. And then later on it would go to the east. The time is up, but I'm intrigued by your point that the increase or the change in the flow of the water would be enough to establish liability. So if a village has problems with flooding, they can't ever change the course of the water without being subject to liability, even if it doesn't establish any further problems for a specific property? How does that work in connection? Well, I think, Your Honor, let me give you maybe an example. If the water, if my backyard drains into my neighbor's backyard, and that's the natural topography. And for whatever reason it is, I decide I'm going to collect my water that drains to my neighbor's backyard, if our backyards are next to each other. I'm going to collect that water, and I'm going to swing it around and dump it into my neighbor's front yard. And I'm going to tell my neighbor, well, it's going to get there anyway. I'm just moving it to your front yard, even though it naturally flows into your backyard. That's a violation of Illinois drainage law, because you're making an artificial channel that's casting water on property that's not in its natural course. That's the whole dispute here. The village is saying we didn't do that. We didn't change the rate or the flow of water onto the property beyond which already existed. The village is saying that you're right. The subject, the water, although by different means, would reach the subject property in a volume and flow as it did. And obviously we disagreed with that. But that doesn't change the fact that the relief sewer does not follow natural drainage. And so what this would allow is the village to say, well, even though your property before flooded in this manner, we're going to change how you flood. But that's okay, because you flooded anyway. But that's not acceptable under Illinois drainage law. Under Illinois drainage law, you have to follow the natural course of drainage. And even if you look at many of the cases where there was improvements made, the government was expanding or following the existing drainage patterns, expanding a ditch, making a ditch bigger. And the question is, did that unreasonably increase the amount of volume and flow? There's no ditch that was where the relief sewer is. That's not how the stormwater flowed to the subject property. It didn't flow down that purple line and then come up. The real issue is the water used to flow there naturally but in a meandering fashion. And now it flows there very quickly, and therefore it rises too fast and goes in the window well? It also depends on what the definition of there is. Right now, with the relief sewer, it's flowing here. Okay? So, yeah, that's the subject property reaches it here. Before, it was overtopping, and this is a testimony of all the experts, and meandering south to east towards Roselle Road. So it's a different drainage pattern than existed before. And the experts agreed on that? Correct. Okay. There's no testimony that where the relief sewer discharges water was the natural point of drainage. So the village's argument is it all gets to the subject property by one means or another, so there's no cause of action. But we believe that's a misreading of Illinois drainage law, that you cannot change, you cannot have an artificial channel that doesn't follow the natural course of drainage. Anything further? No. All right. Thank you very much, Mr. Griffin. Thank you. Mr. O'Reilly, on behalf of the appellants. Thank you. May it please the Court, Counsel? I represent the village of Roselle. As this Court's questions of counsel for the plaintiff appear to infer to myself, I have the same question. What is he appealing? Wasn't there some testimony, I think it was by the plaintiff, the son, or the owner of the property, that the effect that this storm, this drain or sewer has on his property is that during major rainstorms before, he had like two issues, and then after, since this sewer system came in, there were many more. I think he said 10. Am I reading that right? Is that correct? You are reading this testimony correctly, that that's what he testified to. Right. And so we had an engineer look at all the climatological data, provide that data to the trial court along with stormwater modeling to determine what exactly occurred in all of those events. They were able to, with the stormwater modeling, take modeling with or without the relief drain so they could compare the two events. The climatological data, very interestingly, and maybe you have memory of these things yourselves, but the main flooding events are four separate occasions. One was in 2008, there was one in 2010, 2011, and there was a 2013 event. So-called 100-year? 100-year storms. But in fairness to the other side, in fairness to the plaintiff, I mean there was some storms there, I believe, that was conceded were not within that category, correct? There were some storms that were very severe but not in the 100-year severe category. For example, he testified about a 2009 storm, which was maybe a 10-year storm or something, which is a very severe storm as well. However, he was impeached on that testimony. He was impeached on two points massively before the trial of the fact, the trial court in this case. He tried to diminish the nature and extent of his flooding pre-relief sewer when there were very minimal storms. He took water in through his window well into his basement and hired a company to extricate it. He called it seepage and it was no big deal. Yet at his trial, or at his deposition testimony, he said, no, I consider it serious, it was serious flooding. And then all of a sudden at trial, in front of the trial judge, when his credibility is at issue, the judge is seeing him being impeached by this. And then he says, he goes on to say, well, exactly what Justice Shostak pointed out, that didn't he testify about the 2009 event where that wasn't as serious as a 100-year storm, it was a 10-year storm. However, he was impeached from that point too because at his deposition. Did the judge make any specific credibility findings? No, he did not make any credibility findings. He sort of didn't really get into that specifically. He absolutely didn't, and he's a very polite judge in that regard. But I certainly argued it strenuously. And he has a right to weigh the credibility of the witnesses. And he found the battle here was really the battle of the experts. Which I think is a relatively fair characterization. But let me see if I can ask you, by pulling out the essence of the plaintiff's argument, he seems to be representing all the experts agreed that by the construction of the relief sewer, the drainage flow or pattern changed. As a corollary to that, he seems to be arguing that that in and of itself would entitle a plaintiff to relief. How do you respond to those points? I vastly disagree with the record on that point and the evidence on that point. I think it was undisputed that the Roselle Road being a north-south street and Glen Lake being about maybe five houses north of the subject property, we're not talking about massive differences here, but that water at Glen Lake would make its way down to the subject property pre-relief drain. That was undisputed by Mr. Hamilton, plaintiff's expert, by Mr. Burke, by the village employees that testified, including Mr. Amons. So you have a little different perspective on the evidence, obviously. Oh, absolutely. And I think that the trial court understood that to be an undisputed point. It was not in vast dispute. So do you have a question? No, go ahead. Finish that thought. Okay, so the point being is that the drainage law that council cites, it says you cannot redirect water from one direction where it would normally flow and flow in a different direction. Well, that didn't occur here. But also then discharge it onto the subject property. Well, that also didn't occur here. What happened here was the relief drain was designed to circumvent the subject property and then tie into the downstream 24-inch drain that then heads down east, down hill, path north, okay? And for the, while I would concede there was evidence of the 2013 storm, the video showing some discharging during that storm, there was no evidence regarding the duration of that discharging. There was no evidence regarding whether that discharging actually made it to the suggesting it did. However, there's an elevation difference between the basin where that, the catch basin is in the post office park just west of Mr. Amon's property. There's, it's a depression so it can draw water to it. It's actually a collection basin. And the point being is the stormwater modeling was able to establish that the water, the surface water that would naturally drain in the same direction to Mr. Amon's property or the subject property would then be circumvented underground for a period of time before ultimately in these horrible storms, these 100-year storms, where the whole system, in fact, not only just Roselle system, but the whole northern Illinois system back surged. So we're dealing with, okay, well, you're going to point out, hey, there's back surging and make a case out of it, but you still have to evaluate whether or not that back surging alone in the depression west of your property makes it to your property. Two, you have to evaluate whether or not it adds any water to your property. So the big basin was bypassing the plaintiff's property. The relief drain itself bypassed the plaintiff's property. It had catch basins all along and to the west of Roselle Road. So if you have Roselle Road here, which is, it's a road that's a DuPage County highway that's elevated somewhat, so the water coming from all directions, the north and the west, would head towards the subject property. Okay? Right. The relief drain was designed in such a way that it would prevent downstream the plaintiff's property. The plaintiff then had his own dedicated line from his property to the 24-inch as well. So the point being is that during the storm events, the stormwater modeling was able to establish that the amount of water, the benefit that that relief drain, even in that storm event, provided to that subject property during the course of that storm event outweighed any possible impact, a temporary back surging during that, I guess, the height of the storm. Storm events aren't just, they're not consistent. They go in waves, as we all know, and if there was a momentary back surging or whatever it might be, there's no evidence, or it wasn't established, it wasn't proven to preponderance of the evidence, that this relief drain was causing an increase of water. In fact, I believe we proved the opposite through extensive stormwater modeling. It did not increase the volume of flow rate coming onto the plaintiff's property. In anything, if anything, it actually helped relieve some of the flooding. That's correct. That's what the trial court found based on the Burke's testimony. It's increased, but also, as counsel pointed out, it's the direction of the water. Right. And I appreciate that you were sitting over there and you couldn't see it, but he suggested that the purple line is the new drain, but when the water would come before in a slower rate, but it would go around the top of the plaintiff's building, not the side where it flooded. You mean the east side of the plaintiff's building? Right there. I'm just saying. Can I step here? Yes, you can. No, no. He pointed out. Here's the purple line is the relief drain. Right, and he suggested that previously the water came down and went over, I'll call it the top of plaintiff's building, came down from the center and went across the top of it to Roselle Road. So my question is, that changed the direction of the water. Roselle Road is elevated by virtue of all of these properties in here, so it can't go uphill. So if you were to stand at the plaintiff's property, I think there's some photos that might depict this, it would actually be significantly higher than the plaintiff's foundation point. In fact, maybe to the point of six feet or so is the direction. Landscaping ramp right to his window wells. I mean, this is a classic case of the water naturally flowed from Glen Lake all the way down directly to the plaintiff's property. They were attempting to address plaintiff's complaints to the village by building this. And if they create catch basins all the way down, the water coming from the west and the north then gets picked up and drops south with downpour of the plaintiff's property in the 24-inch drain, and that was the benefit. We proved it through stormwater modeling. That's the point, is that, hey, look, there may have been a 100-year storm where there was some back-surging at that drain, including all the other drains in the county. However, they were able to show that that back-surging did not get to the plaintiff's property. There's also an elevation between the west of the plaintiff's property and the basin where that exists. It's a park there, and there's a basin, and you can see, I guess you could say at 14, there's actual elevations. It's topographical mapping. You can see that there is a significant increase in the elevation between those two properties. Counsel, I'll let you go back to the podium. One question that Mr. Griffin didn't get to address, and maybe he can address this in rebuttal, is Count 5, the takings, the takings claim. I think the trial court dismissed that claim, and one of the reasons they said that there was no intention. Do you need intention in takings? The case law refers to it as intentional or foreseeable. Reasonably foreseeable. Reasonably foreseeable. When I say he, plaintiff's expert who opined to the report that was attached to the complaint and then thus made an admission on the record, which plaintiff does not make part of this appeal, that decision, however, the trial court relied upon the plaintiff's expert's concession that, first of all, the outline of what this relief drain does. He describes it, and he talks about how it ties in downstream to the 24-hour. So he's aware of that concession with the report, and he concludes by saying clearly this is an unintentional error. Not just that clearly it was unintentional, but it was an unintentional error. And in the context of the way this relief drain, the way the expert describes the construction of this relief drain and what it's intended to do and what the side effect, if you will, the court, I believe, correctly determined that for a takings case, that doesn't rise to the level of foreseeability in the context of a takings case. It wasn't the village engaging in an action that took the plaintiff's property. I mean, ultimately, interestingly in this instance, the case went to the trier of fact and was decided that it doesn't increase the water at all. Thus, I would argue no takings. However, that's not what's before this court. But a takings can be sustained even where the flooding was unintentional. I mean, in this case, the trial court found that there was no flooding, whether it's intentional or unintentional. Right. But I think what he said was, I think he said that the takings, there had to be intentional or there had to be intention in order to have a taking. I don't think he, well, I don't want to. Well, recent case law would seem to support what he's saying. I think there's been some developments. It doesn't, it can be an unintentional application. I think the trial court said the village had not intended to cause the flooding of the property. I would suggest this about the standard that foreseeability applies in this setting. I believe that by virtue of the concession, that it was clearly unintentional error in the context of the factual scenario the expert laid out for the trial court, that it was also did not quantify as foreseeable under the takings clause. And by virtue of that, if you look at the cases where they say that it can also be a foreseeable result, if you look at those factual scenarios, they're massively different. We're not dealing with a village that created a stormwater improvement and then years later when the 100-year storm hits is now looking back and saying, you know, what happened, do you follow me? Well, if you take plaintiff's allegations as true, which we've proven they're not, however, or they failed to prove that they are, however you want to regard that. If you take their allegations as true, the concessions made by the expert on the nature of the installation of this relief drain and the unintentional error aspect of its effect on the subject property is not a takings from the standpoint of a government engaging in a conduct that is taking someone else's property. We were not discharging a pipe onto his property for the benefit of the public at large. The question then becomes whether at the time of the conception of that relief drain and the installation of that relief drain, if it was foreseeable under the Constitutional Takings Clause that that was a likely result of their conduct. I don't believe that's. Well, you certainly would. And I don't believe that. Well, see, you'd end up in the same place because even if the trial court erred, and quite frankly it appears it may have under recent case law with regard to the elements of the takings, if the trial court was correct in its determination that the relief sewer did not cause or contribute any additional flooding, it wouldn't matter if it erred under that standard, correct? It would be harmless error, correct, at this point. So with that, if there's no further questions, I think I will rest. Thank you. Mr. Griffin, may I address the board for rebuttal? Well, first I'll address the takings complaint. That was count five of our second medical complaint, and that was dismissed at the pleading stage, so that was not tried at the trial. And the pleading requirements for taking based on the flooding case are intentional or foreseeable, and it's an either or. And what the trial court did was find that, based upon a statement made by the plaintiff's expert, that it was not intentional. But the trial court did not at all address the foreseeability. Well, let's assume the trial court erred, so you don't spend all of your time on that. In the standard of foreseeability, you're correct on that. You go back to if the trial court was correct that the relief sewer, again, the overarching issue didn't contribute or cause any additional flooding on the plaintiff's property, does it really matter for purposes of injunctive relief if it misapplied the standard? Well, I think it does. It has to be based on something. I mean, I think it does, Your Honor, and here's why. Prior to the relief sewer, it was a natural flow that would reach the subject property. It was a natural flow. Now the village has created an artificial device which doesn't work, and when it doesn't work during heavy floods, the water bubbles up and dumps onto the subject property. But is it foreseeable? We plant facts in the complaint that that was foreseeable based upon the topography of the property, based upon the sizes of the pipe, and based upon the fact that we notified the village that this was occurring. And in the Arkansas Supreme Court case, the court, in remanding that case back, found that a warning could create a foreseeable circumstance where the government is told, you are causing this, that then future flooding is now foreseeable because the government's been informed of its action. And that was the fact pattern in Arkansas game where it wasn't intentional, it wasn't the intent of the government to flood the plaintiff's property, but they were notified of it, and the court said, you know, that could be, that can create a foreseeability issue when you're notified of that. Obviously, we didn't get beyond the pleading stage. But ultimately here, I think what my colleague is driving at is the court found there was no change in this water flow. There was no difference here. You didn't prove that up. The court believed the village's expert that said this is not what caused this water. The court did believe the village's expert or found that more, I guess. The court really didn't disbelieve our expert, but just found, you know, it's better. The court certainly found both experts were very well qualified. So how do we reverse that finding based on what? Well, first of all, you can reverse the finding because the court misapplied Illinois drainage law because this is an unnatural artificial device which is not, does not maintain the natural course of drainage. There has to be your argument here. Otherwise, the law is very well set up that in a bench trial, the court is the sole judge of the credibility and believability of the witnesses and the weight to be given to the testimony. And as a corollary of that, when it comes to manifest weight, there's a whole plethora of case laws that says we cannot substitute our judgment for that of a trial court in matters of weight and credibility and expert testimony. For a manifest weight, it would be a very high hurdle for you to overcome. You're better off with your argument that you're making here. I'm glad I started off with the right argument. It's a very true argument. It has intuitive appeal. All right. And, Your Honor, just to, I just want to quote Mr. Burns. He was the village engineer, maybe the public works director. But he was a licensed engineer that testified. And testimony at trial, he was asked a question. Question. Before the relief sewer was constructed, the water would pool around Glenlake Avenue, correct? Answer. Pool around Glenlake Avenue, and at some point in a high-intensity rain event, long duration, it would meander south and southeast toward 20 North Roselle Road, 20 North Roselle Road, the address of the subject property. So there's even the village's own engineer talking about what the drainage pattern was before the relief sewer. It's completely different now. Now the water is bubbling out west of the subject property, getting into the parking lot and then into the basement of the subject property. That alone is a violation of Illinois drainage law, and there was no dispute on that. And that was an error that we respectfully believe the trial court committed in not finding a violation based upon those undisputed facts. Thank you, Your Honor. All right. I'd like to thank both counsel sincerely for the quality of their arguments here this morning. The matter, of course, will be taken under advisement, and a written decision will be entered in due course. Thank you. We'll be at recess just while we prepare for the next case.